## ELLIOT et al. v. ATLANTIC CITY.

(Circuit Court, D. New Jersey. January 11, 1907.)

**1. QUIETING TITLE—EVIDENCE.**

In a suit to quiet title to certain land, the fact that buildings which were formerly located on the land, and which were removed therefrom but two or three years prior to the beginning of the suit, and the construction and maintenance of jetties from the land in question into the ocean, was admissible as evidence of complainants' title.

**2. SAME—JURISDICTION—REQUISITES—NATURE OF POSSESSION.**

In a suit to quiet title to certain land, authorized by Laws N. J. 1870, p. 20, c. 153, possession in fact, as distinguished from constructive possession, arising merely by virtue of the legal title, is essential to confer jurisdiction on the court to try such action.

[Ed. Note.—For cases in point, see Cent. Dig. vol. 41, Quieting Title, § 8.]

**3. SAME.**

In a suit to quiet title, as authorized by Laws N. J. 1870, p. 20, c. 153, actual possession of the principal tract is sufficient possession of adjoining uninclosed land in controversy, held under the same title and used in connection with such principal tract.

**4. DEDICATION—STREETS—MAPS—CONSTRUCTION.**

A map of a city as originally drawn showed M. avenue to be a street 100 feet wide, but before the map was filed a line had been drawn through the center of the street for a space of four blocks, broken at each intersecting street for a distance equal to the width thereof, and side lines were drawn from the ends of the center line thus broken to the corners of each block fronting an inlet of the ocean, so that within each of such four blocks one-half of the street had apparently been cut off and added to the adjacent block. *Held*, that the filing of the map in such condition operated as a dedication of only 50 feet for M. avenue along the blocks in question.

**5. NAVIGABLE WATERS—ACCRETION—RELICTION.**

Where land embraced within the lines of a street as dedicated was subsequently eaten away by tide water and thereafter replaced by accretion, the land so added was subject to the easement created by the dedication.

**6. EMINENT DOMAIN—MUNICIPAL CORPORATIONS—STREETS—IMPROVEMENTS—ORDINANCES.**

Where a street as originally dedicated was only 50 feet wide, the city could not acquire a right to more than the amount dedicated, either by an improvement ordinance or in any other manner except by condemnation proceedings.

**7. DEDICATION—ACCEPTANCE.**

After the dedication of a street the city passed an ordinance providing that all avenues, streets, and highways within the corporate limits of the city then laid, used, designated, or delineated on the maps and plans of the city, or dedicated to public use within the corporate limits of the city, were thereby accepted and declared to be streets, avenues, etc., within the control of the city. *Held*, that such ordinance took effect immediately, so that a street shown on the original plan of the city then became a public street to the full extent of its dedication.

**8. VENDOR AND PURCHASER—BONA FIDE PURCHASER—NOTICE.**

Complainants' predecessor in title commenced suit in a state court against defendant city to quiet title to certain land in controversy claimed by the city for street purposes, and a final decree was entered against

defendant. Before complainants purchased the land, they obtained information concerning such decree from the solicitor of complainants' grantors, who, however, failed to inform them that the decree had been opened, and that the city had been allowed to answer, and that there had been no final hearing. Complainants purchased without an examination of the records.· *Held*, that they assumed the risk of the truth of the solicitor's statement, and that the decree did not operate as an estoppel against the city.

In Equity. On bill to quiet title.

Thompson & Cole, for complainants.

Harry Wooten and Godfrey & Godfrey, for defendant.

CROSS, District Judge. The bill of complaint herein is filed to quiet the title to certain real estate at Atlantic City under an act of the state of ·New Jersey entitled "An act to compel the determination of claims to real estate in certain cases, and to quiet the title to the same," approved March 2, 1870 (Laws 1870, p. 20, c. 153, and the amendments thereto). The controversy is over the alleged existence across the premises described in the bill of complaint of an avenue designated as Maine avenue, between Atlantic and Baltic avenues, and, if such an avenue be found to exist, then as to its width. The complainants admittedly have an undisputed title to the lands described in their bill, and, indeed, all of the jurisdictional facts are admitted, except that the complainants are in peaceable possession of the lands in controversy. It appears that the lands are beach lands, and a portion of them, at least, is subject to the ebb and flow of tidal water ·from Absecon Inlet and the Atlantic Ocean. I think the complainants have shown all the possession that the lands are capable of in their natural condition, and that such possession is peaceable. They have shown that there was a large building upon the land but two or three years prior to the time they purchased it; that such building stood there for several years, until it was injured by a storm, when for that reason it was removed by its owners. The piles, however, upon which it was constructed, still remain. At the time the building was there, there was also adjacent to it a toboggan slide. Both of these structures were used, for a considerable period of time, for amusement purposes. Moreover, after the complainants acquired title, they built jetties upon the property at different places, with the intent of reclaiming the submerged portion of the land from the ocean. These jetties were in existence when this suit was commenced, and the right of the complainants to erect and maintain them does not appear to have been disputed. In 1901, after the complainants acquired title, the city constructed a temporary boardwalk over a portion of the lands, which, however, it subsequently removed upon notice from the complainants that such act constituted a trespass; and furthermore, the city subsequently accepted a grant from the complainants, the exact object and purport of which, however, does not appear. In Oberon ·Land Company v. Dunn et al., 56 N. J. Eq. 749, 40 Atl. 121, Vice Chancellor Gray, speaking of the possession required by the statute to confer jurisdiction upon the court, says:

"This peaceable possession must exist at the time of the filing of the bill; but the evidence of such a possession may be the action of the complainant, and

of those under whom it claims, at any reasonable time preceding the beginning of the action in this court. Any acts regarding the premises which would naturally convey to an onlooker the sense that the party doing or directing them was the owner are evidential of such a possession as the statute contemplates. These acts must necessarily vary greatly, according to the character of the property in question. A house would not be dealt with as would a tract of woodland, nor a sand beach property as would a farm."

The doctrine thus enunciated is reasonable, and applicable to the point under consideration. I think it entirely proper to consider the buildings which were formerly located upon the land, and which were removed therefrom but two or three years prior to the beginning of this suit, as well as the construction and maintenance of the jetties, as evidence of complainants' possession. The testimony also indicated other acts of possession of a less conspicuous character, which it seems unnecessary to set forth. Possession in fact, as distinguished from constructive possession, which arises simply by virtue of the legal title, is essential to confer jurisdiction upon the court; but actual possession of the principal tract is sufficient possession of adjoining unin-closed land, held under the same title and used in connection therewith. Sheppard v. Nixon, 43 N. J. Eq. 627, 13 Atl. 617; Yard v. Ocean Beach Association, 49 N. J. Eq. 306, 24 Atl. 729.

The defendant sets up a claim to an easement over a portion of the land in controversy for the purpose of a public street or highway. The portion thus claimed is alleged to be 100 feet in width, and to extend across the property from Baltic avenue to Artic avenue, and is known as Maine avenue. The city maintains the existence of such avenue by reason of a dedication made by predecessors in title of the complainants, who in 1852 filed a map, known in the case as "Plan of Atlantic City," on which Maine avenue was laid down, and also because by divers subsequent deeds, appearing in the chain of title to the plot of ground described in the bill of complaint, Maine avenue has been recognized. It is contended on behalf of the complainants, however, that the city is estopped from claiming such dedication of the avenue for reasons which will appear later; and further, that if not so estopped, such dedication exists only as to an avenue 50 feet in width, or, at the most, 75 feet in width, and not to an avenue 100 feet in width, as claimed by the city. The map above referred to embraces a very large tract of land, practically the entire site of Atlantic City. It is drawn to a scale, and counsel for both parties agreed that for some portion of its length Maine avenue, measured by such scale, is 100 feet in width, and as laid down on said map extends for a distance of eight blocks. The original map was not produced, but a copy was, and counsel agreed that the lines on the original map indicating Maine avenue are blue in color, and that, measuring from the north end thereof southward for four blocks, the street as indicated thereon is undoubtedly 100 feet wide. Beginning, however, with Baltic avenue, and for the remaining four blocks, including the block in question, a line has been drawn through the center of Maine avenue of the same color and size as the side lines; that this line is broken at each intersecting street for a distance equal to the width of such intersecting street, to allow for its uninterrupted passage, and that side lines

are drawn: from the ends of the center line thus broken to the corners of each block fronting the inlet, the effect of which is that at each block apparently one-half of Maine avenue has been cut·off, inclosed with, and added to, the adjacent block; or, stated in another way, each block from Baltic avenue southward on the side of Maine avenue toward the inlet, including the one in controversy, has been extended so as to include 50 feet of Maine avenue as originally·laid down on the map. This is the situation as shown by the map when it was filed. There is no testimony offered to explain why the map was thus made. The deeds above referred to throw no light upon the question involved; they do, indeed, recognize Maine avenue as existing, but do not show its width, or not with any degree of certainty. The map must therefore speak for itself, and be interpreted by the court as any other writing would be, with the sole object of determining therefrom the intention of its makers. The question of dedication is always one of intention, to be derived from existing facts or circumstances. The rule as laid down in 9 Am. & Eng. Ency. of Law (2d Ed.) title "Dedication," p. 36, and which is abundantly supported by authority, is as follows:

"An intention on the part of the owner of the land to part with some right therein, and to vest an easement in the public, is the first essential of a valid dedication, for one cannot be deprived of his property without compensation against his will. Animus dedicandi is the vital principle, and if this is not present the dedication fails. * * * As the intent of the owner is essential, it must be clearly and positively shown."

Speaking in a general way, the distance between the easterly line of Maine avenue and Absecon Inlet, as shown on the map, is on an average about twice as great in front of the blocks where Maine avenue is admittedly 100 feet wide as it is in front of the blocks where it has been divided as above stated, and counsel for the complainant argues that this fact discloses the reason why Maine avenue was apparently narrowed to one-half its original width; his point being that, when the map was finished, but before it was filed, or any dedication of the street made, it was discovered that the block in controversy and the remaining blocks southward of it were of insufficient depth for building purposes unless 50 feet were taken off from Maine avenue as originally planned, and added to them. I can see no reason, and none has been suggested, why Maine avenue should have been treated as it was at this point and beyond to the ocean, unless the intention was to narrow Maine avenue. The suggestion of counsel, therefore, seems pertinent and forceful. It clearly was the original intention of the dedicators to have the street 100 feet in width throughout, but it is equally clear to my mind that before the map was filed its width for a certain distance was for some reason narrowed to 50 feet. The problem, with such light as exists, is somewhat perplexing, since it is difficult to say with absolute certainty what the intention of the owners of the land was when they made and filed this map, but I do not see my way clear to say that land which was with apparent deliberation carved off from the street of which it had clearly been intended to form a part, and then attached to and inclosed with an adjacent block, thereafter remained a part of the street. As a matter of fact,

it is not a part of the street; it is excluded therefrom. The case of Princeton v. Templeton et al., 71 Ill. 68, is worthy of consideration upon the question of the proper construction of the map. My conclusion is that the dedicators originally entertained the idea of laying out the street to the width of 100 feet throughout its entire length, but subsequently, and before the map was filed or deeds referring thereto were made, for some reason (and it is a matter of indifference what the reason was), changed their mind, and narrowed it to 50 feet. Upon the facts presented, Maine avenue was dedicated across the land described in the bill of complaint from Baltic to Artic avenues of a width of 50 feet and no more.

Plaintiffs' counsel, however, insist that the defendant has lost its right to set up this dedication, because the land embraced within the lines of Maine avenue as dedicated, whatever its width, was subsequently to the dedication encroached upon and eaten away by tidal water, and that the land subsequently formed by accretion over the site of Maine avenue is discharged from the easement. The rule as laid down in Am. & Eng. Ency. of Law (2d Ed.) vol. 1, p. 469, title "Accretion," is as follows:

"The general rule is that to the owner of the shore belong these imperceptible and insensible additions to his lands, which when once acquired become in all respects a part of the original tract; the title thereto being held subject to the same incumbrance and with the benefit of the same rights as is the land to which accretion is made."

The above quotation has to do with the question of property in lands formed by accretion, but later in the same volume, on page 474, in dealing with the title to land which has reappeared after submergence, the following statement is made:

"It seems that, although land be submerged by the sea, yet if it eventually reappears and remains capable of identification, the title thereto revests in the original owner."

I have not been referred to any cases which show or tend to show that land reappearing after submergence would thereupon be free from any lien, charge, or easement which existed at the time of its disappearance. I cannot conceive in principle why such should be the case. The same principle which would restore the land to the owner would likewise protect the rights of those having liens, incumbrances, or easements thereon. The owner would have his property restored cum onere. If the owner lost his land by submergence, an imcumbrancer would also lose his lien, but upon the restoration of the land to the owner, the right of the incumbrancer would also, and by the same act, be restored.

Three ordinances have been offered in evidence as affecting Maine avenue either directly or indirectly. Two of them, those of October 26, 1857, and March 5, 1862, provide for the opening, grading, and otherwise improving Maine avenue, and further recognize Maine avenue as 75 feet in width. It is claimed that these ordinances estop the city from claiming in any event a greater width than 75 feet for Maine avenue, but in the view I have taken of the dedication, these ordinances are immaterial, for if the street were only dedicated 50

feet wide, as I have found the fact to be, the city could not by ordinance open it to any greater width, except by condemnation proceedings and payment to the property owner for the additional land taken. Nothing further, however, was done under these ordinances, so far as appears, in front of the land in question. Another ordinance, that of July 24, 1877, was offered in evidence. It provides that all avenues, streets, and highways within the corporate limits of Atlantic City then laid, used, or designated or delineated on the maps and plans of Atlantic City, or dedicated to public use within the corporate limits of said city, were thereby accepted and declared to be streets, avenues, etc., within the jurisdiction of the city council, with full power to control and regulate the same. The last-mentioned ordinance took effect immediately, and from and after that date Maine avenue undoubtedly became a public street to the full extent of its dedication, but beyond this fact it has no bearing upon the question under consideration. My conclusion, therefore, is that, upon the case as presented, there exists an easement of a public street running over the lands described in the bill of complaint of a width of 50 feet, and that said street, thus dedicated and accepted, constitutes the westwardly half of Maine avenue as originally laid down on the above-mentioned map.

The complainants contend, however, that the defendant is estopped as to them from claiming or using said street for the reason that the Baltic Pier Pavilion Company, a former owner of complainants' title began a suit in the Court of Chancery of this state against the defendant herein to quiet the title to the lands in controversy, and that a final decree was entered by default in said suit, which declared that the defendant had no interest in the premises, and that subsequent thereto the complainants purchased said premises for a valuable consideration, relying upon the force and effect of said decree. The evidence shows, indeed, that such a suit was commenced and such a decree was entered, but it also shows that, some time before the complainants purchased the land in question, the decree was opened by the said court, and the defendant allowed to come in and file an answer, which it did, and that thereafter the suit was not brought to final hearing, but was subsequently discontinued, and the present suit instituted in this court. The only knowledge that the complainants appear to have had of the entry of the final decree above mentioned was obtained from the solicitor of the complainant in that suit. It is not pretended that they ever examined the record in the suit, and, if they had, they would necessarily have been apprised of the fact that the decree had been subsequently opened. They had no right to rely upon the representations of the solicitor of the complainant, and in doing so they assumed the risk. Such solicitor had no right or authority to speak for the defendant, and what he said or failed to say could in no wise estop the defendant; moreover, the record was at all times open to them, and was manifestly the only primary evidence of the status of the suit. A decree will be entered in accordance with the views above expressed.